UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF IOWA
EASTERN DIVISION

| | |
|---|---|
| GREAT RIVER ENTERTAINMENT, LLC,<br><br>            Plaintiffs,<br><br>v.<br><br>ZURICH AMERICAN INSURANCE COMPANY, OR ZURICH,<br><br>            Defendant. | No. 3:21-cv-00035-RP-SBJ<br><br><br>**PLAINTIFF'S FIRST AMENDED AND SUBSTITUTED COMPLAINT AND JURY DEMAND** |

COMES NOW the Plaintiff, Pursuant to Fed. R. Civ. 15(a)(1)(B), and prior to Defendants' filing of responsive pleading, hereby submits it First Amended and Substituted Complaint and Jury Demand:

## PARTIES AND JURISDICTION

1.      This Petition is for a civil action in which Plaintiff seeks to recover damages for breach of contract caused by Defendant's denial of a business interruption insurance claim, and further seeks declaratory relief regarding the coverage provided under Plaintiff's insurance policy.

2.      Since the filing Plaintiff's initial Petition in state court, Plaintiff has gained additional information and knowledge regarding COVID-19, including the impact COVID-19 has had on and within its facility.

3.      Plaintiff, Great River Entertainment, LLC, is an Iowa limited liability company whose principal place of business is Burlington, Iowa.

4.     Great River Entertainment, LLC owns, operates, and manages a casino, six hotels, a convention center and banquet operation, various food and beverage restaurants, an arcade and bowling center, water park, and various other operations primarily located in Burlington, Iowa.

5.     Upon information and belief, Zurich American Insurance Company, or Zurich, is authorized to sell property casualty insurance and business interruption insurance in Iowa.

6.     That Defendant is listed as being licensed in Iowa and whose business corporate address is 1299 Zurich Way, Schaumburg, IL  60196.

7.     The insurance policy at issue (the "Policy") was purchased and primarily to be enforced and interpreted in Burlington, Iowa.  A copy of the Policy is attached hereto as Exhibit A.

8.     The Plaintiff submitted a claim for insurance benefits to Defendant provided for in the Policy and Defendant denied the claim by letter dated February 25, 2021.  A copy of the declination letter is attached hereto as Exhibit B

9.     The damages giving rise to this Petition are sufficient to meet the jurisdictional requirements for the amount in controversy.

10.     Jurisdiction is conferred upon this court pursuant to 28 U.S.C. 1332(a)(1).

11.     Venue is conferred pursuant to 28 U.S. Code § 1391.

## **COVID-19**

12.     In December 2019, an outbreak of illness known as COVID-19 caused by a novel coronavirus formally known as SARS-CoV-2 was first identified in Wuhan, Hebei Province, China.

13.     COVID-19 is a severe infectious disease causing serious systemic illness and death.[1] To date, there have been over 121 million confirmed cases of COVID-19 (over 29.5 million of them in the US alone) and over 2.6 million deaths worldwide.[2] Due to pervasive spread and presence of Coronavirus and COVID-19 across the planet, both are presumed to be present or imminently present everywhere.[3]

14.     The existence and/or presence of the Coronavirus and COVID-19 is not simply reflected in reported cases or individuals' positive test results. The Centers for Disease Control and Prevention ("CDC") estimates that the number of people in the U.S. who have been infected with COVID-19 is likely to be 10 times higher than the number of reported cases.[4] Additionally, at least 40% of people infected with COVID-19 are asymptomatic.[5] COVID-19 also includes a pre-symptomatic incubation period of up to 14 days, during which time infected people can transmit COVID-19 to people, into the air and onto surfaces without having experienced symptoms and without realizing that they are infected.[6]

---

[1] Tianna Hicklin, *Immune cells for common cold may recognize SARS-COV-2*, NAT. INST. OF HEALTH (Aug. 18, 2020), https://www.nih.gov/news-events/nih-research-matters/immune-cellscommon-cold-may-recognize-sars-cov-2 (last visited Mar. 20, 2021).

[2] *Coronavirus Disease 2019 (COVID-19),* CDC, updated Mar. 20, 2021, https://covid.cdc.gov/covid-data-tracker/#datatracker-home (last visited Mar. 20, 2021);

[3] *See, e.g.*, Christopher Ingraham, *At the population level, the coronavirus is almost literally everywhere,* WASH. POST, Apr. 1, 2020, https://www.washingtonpost.com/business/2020/04/01/population-level-coronavirus-is-almostliterally-everywhere/ (last visited Mar. 20, 2021).

[4] Lena H. Sun and Joel Achenbach, *CDC chief says coronavirus cases may be 10 times higher than reported,* WASH. POST (June 25, 2020), https://www.washingtonpost.com/health/2020/06/25/coronavirus-cases-10-times-larger/ (last visited Mar. 20, 2021).

[5] Ellen Cranley, *40% of people infected with covid-19 are asymptomatic, a new CDC estimate says,* BUS. INSIDER (July 12, 2020), https://www.businessinsider.com/cdc-estimate-40-percentinfected- with-covid-19-asymptomatic-2020-7 (last visited Mar. 20, 2021).

[6] *See* WHO, *Coronavirus disease 2019 (COVID-19) Situation Report - 73* (Apr. 2, 2020), https://apps.who.int/iris/bitstream/handle/10665/331686/nCoVsitrep02Apr2020-eng.pdf?sequence=1&isAllowed=y (last visited Mar. 20, 2021); Minghui Yang , Liang Li , Ting Huang, Shaxi Li, Mingxia Zhang, Yang, Yujin Jiang, Xiaohe Li, Jing Yuan, and Yingxia Liu, *SARS-CoV-2 Detected on Environmental Fomites for Both Asymptomatic and Symptomatic Patients with COVID-19*, https://doi.org/10.1164/rccm.202006-2136LE (last visited Mar. 21, 2021).

15.     Studies have demonstrated that pre-symptomatic individuals have an even greater ability to transmit COVID-19 than other infected people because they carry the greatest "viral load."[7] The National Academy of Sciences has concluded that "the majority of transmission is attributable to people who are not exhibiting symptoms, either because they are still in the presymptomatic stage or the infection is asymptomatic."[8]

16.     As early as February 26, 2020, the CDC advised that COVID-19 was spreading freely without the ability to trace the origin of new infections, also known as community transmission or community spread.

17.     COVID-19 is highly contagious, uniquely resilient, and potentially deadly. The degree to which an infectious disease is contagious is measured by R0, a term that defines how many other people will become infected by one person with that disease. Studies have concluded that one person with the Coronavirus will infect up to 5.7 others (R0 ≈ 5.7), which is much higher than seasonal influenza for example, where on average, one person will infect only 1.3 others (R0 ≈ 1.3).[9]

18.     The Coronavirus can remain infectious for "much longer time periods than generally considered possible."[10] In the Journal of Virology, researchers demonstrated that the Coronavirus can survive up to 28 days at room temperature (68ºF) on a variety of surfaces

---

[7] *See, e.g.*, Xi He et al., *Temporal dynamics in viral shedding and transmissibility of COVID- 19,* 26 NATURE MED. 672, 674 (Apr. 15, 2020), https://www.nature.com/articles/s41591-020- 0869-5 (last visited Mar. 20, 2021); Lirong Zou, M.Sc., *et al., SARS-CoV-2 Viral Load in Upper Respiratory Specimens of Infected Patients,* NEW ENG. J. OF MED. (Mar. 19, 2020).

[8] Meagan C. Fitzpatrick, Alison P. Galvani, Seyed M. Moghadas, Abhishek Pandey, Pratha Sah, Affan Shoukat, and Burton H. Singer, *The implications of silent transmission for the control of COVID-19 outbreaks*, 117 PNAS 30, 17513-15, July 28, 2020 https://www.pnas.org/content/117/30/17513 (last visited Mar. 20, 2021).

[9] M. Cevik, C.C.G. Bamford, A. Ho, *COVID-19 pandemic-a focused review for clinicians*, 26 CLIN MICROBIOL INFECT. 7, 842-47 (July 2020), https://www.clinicalmicrobiologyandinfection.com/article/S1198-743X(20)30231-7/fulltext (last visited Mar. 20, 2021).

[10] Shane Riddell, Sarah Goldie, Andrew Hill, Debbie Eagles & Trevor W. Drew, *The effect of temperature on persistence of SARS-CoV-2 on common surfaces*, 17 VIROLOGY J. 145 (2020), https://doi.org/10.1186/s12985-020-01418-7 (last visited Mar. 20, 2021).

including glass, steel, vinyl, plastic, and paper.[11] A CDC report from March 27, 2020, stated that the Coronavirus was identified on surfaces of the cabins on the Diamond Princess cruise ship 17 days after the cabins were vacated but before they were disinfected.[12] Numerous other scientific studies and articles have identified the persistence of the Coronavirus on doorknobs, toilets, faucets and other high-touch points, as well as on commonly overlooked surfaces such as floors.[13]

19.     The World Health Organization ("WHO") states that "[t]he disease spreads primarily from person to person through small droplets from the nose or mouth, which are expelled when a person with COVID-19 coughs, sneezes, or speaks . . . . People can catch COVID-19 if they breathe in these droplets from a person infected with the virus . . . . These droplets can land on objects and surfaces around the person such as tables, doorknobs and handrails. People can become infected by touching these objects or surfaces, then touching their eyes, nose or mouth."[14]

20.     The toll of the Coronavirus and COVID-19 on lives, property and businesses in Iowa, the U.S. and around the world has been calamitous and is among the worst public health and economic catastrophes of the last 100 years.

21.     Indeed, as of April 28, 2021, the State of Iowa reported 393,458 total positive tests and 5,930 total deaths since the start of the pandemic.[15]

---

[11] *Id.*

[12] Leah F. Moriarty, Mateusz M. Plucinski, Barbara J. Marston, et al., *Public Health Responses to COVID-19 Outbreaks on Cruise Ships — Worldwide, February–March 2020*, 69 MMWR 12, 347-352, March 27, 2020, https://www.cdc.gov/mmwr/volumes/69/wr/mm6912e3.htm (last visited Mar. 20, 2021).

[13] Zhen-Dong Guo, Zhong-Yi Wang, Shou-Feng Zhang, Xiao Li, Lin Li, Chao Li, Yan Cui, Rui-Bin Fu, Yun-Zhu Dong, Xiang-Yang Chi, Meng-Yao Zhang, Kun Liu, Cheng Cao, Bin Liu, Ke Zhang, Yu-Wei Gao, Bing Lu, Wei Chen, *Aerosol and Surface Distribution of Severe Acute Respiratory Syndrome Coronavirus 2 in Hospital Wards, Wuhan, China, 2020,* 26 EMERG.INFECT. DIS. 7, 1583-91 (July 2020), https://pubmed.ncbi.nlm.nih.gov/32275497/ (last visited Mar. 20, 2021).

[14] *Q&A on coronaviruses (COVID-19)*, World Health Organization, https://web.archive.org/web/20200506094904/https://www.who.int/emergencies/diseases/novelcoronavirus-2019/question-and-answers-hub/q-a-detail/q-a-coronaviruses (last visited Mar. 20, 2021).

[15] https://coronavirus.iowa.gov/

22.     To date, COVID-19 has killed more than 2.6 million people worldwide, and over 538,000 in the United States.[16]

23.     The widespread physical loss of or damage to property throughout Iowa and the world caused by the Coronavirus and COVID-19 has been disastrous for businesses like Great River Entertainment.

24.     At its peak, over 4,000 Americans were perishing per day from COVID-19.[17]  A substantial number of Americans are still dying daily, with surges of cases and new and ever more contagious variants of the Coronavirus occurring throughout the United States.[18]

## COVID-19 CAUSES DIRECT PHYSICAL LOSS OF OR DAMAGE TO PROPERTY

25.     The omnipresence of COVID-19 and COVID-19 is enabled by multiple modes of viral transmission, including respiratory droplets, airborne and fomite transmission (i.e., transmission from surfaces and objects).[19]  These transmission methods demonstrate that COVID-19 and/or COVID-19 cause direct physical loss of or damage to property.

26.     Respiratory transmission of COVID-19 occurs through exposure to an infected person's respiratory particles, such as from saliva or mucus.[20]  Respiratory transmission of COVID-19 is commonly divided into droplets (larger particles that have a transmission range of about six feet) and airborne (smaller particles that can remain suspended in the air for prolonged

---

[16] *Coronavirus Disease 2019 (COVID-19),* CDC, updated Mar. 20, 2021, https://covid.cdc.gov/covid-data tracker/#datatracker-home (last visited Mar. 20, 2021);

[17] Eugene Garcia, Lisa Marie Pane and Thalia Beaty, *U.S. tops 4,000 daily deaths from coronavirus for 1st time*, AP NEWS, Jan. 9, 2021, https://apnews.com/article/us-coronavirusdeath- 4000-daily-16c1f136921c7e98ec83289942322ee4 (last visited Mar. 20, 2021).

[18] https://covid.cdc.gov/covid-data-tracker/#trends_dailytrendsdeaths (last visited Mar. 20, 2021); Johns Hopkins Medicine, *Coronavirus Second Wave? Why Cases Increase*, updated Nov. 17, 2020, https://www.hopkinsmedicine.org/health/conditions-and-diseases/coronavirus/firstand-second-waves-of-coronavirus (last visited Mar. 20, 2021).

[19] *See, e.g.*, WHO, *Transmission of SARS-CoV-2: implications for infection prevention precautions* (Jul. 9, 2020), https://www.who.int/news-room/commentaries/detail/transmission-of-sars-cov-2-implications-for-infection-prevention-precautions (last visited Mar. 20, 2021).

[20]  *Id.*

periods of time) modes of transmission.  Though convenient, this binary division is an

oversimplification that underscores transmission risk.[21]  Humans produce a wide range of

particle sizes when coughing, sneezing, talking, singing, or otherwise dispersing droplets, with

pathogens predominating in the smallest particles.[22]  Respiratory particles produced by the

average person can travel almost 20 feet by sneezing.[23]  An M.I.T. researcher has found that

virus-laden "clouds" containing clusters of droplets can travel 23 to 27 feet.[24]

27.     Airborne transmission involves the spread of the infectious agent caused by the

dissemination of droplet nuclei (aerosols) from, for example, exhaled breath, that remain

infectious when suspended in the air over long distances and time.[25]  These tiny particles can

remain suspended "for indefinite periods unless removed by air currents or dilution

ventilation."[26]  As a result, the risk of disease transmission increases substantially in enclosed

environments, compared to outdoor settings.[27]

28.     The WHO and the scientific community have studied the spread of COVID-19

through aerosols in indoor settings via air circulation systems.  For example, the CDC published

---

[21] Kevin P. Fennelly, *Particle sizes of infectious aerosols: implications for infection control*, 8 LANCET RESPIRATORY MED. 9, P914-24 (Sept. 1, 2020), https://www.thelancet.com/journals/lanres/article/PIIS2213-2600(20)30323-4/fulltext (last visited Mar. 20, 2021).

[22] *Id.*

[23] *Id.*

[24] Lydia Bourouiba, *Turbulent Gas Clouds and Respiratory Pathogen Emissions, Potential Implications for Reducing Transmission of COVID-19*, 323 JAMA 18, 1837-38, Mar. 26, 2020, https://jamanetwork.com/journals/jama/fullarticle/2763852 (last visited Mar. 20, 2021).

[25] *Id*; *see also* Jose-Luis Jimenez, *COVID-19 Is Transmitted Through Aerosols. We Have Enough Evidence, Now It Is Time to Act*, TIME, Aug. 25, 2020, https://time.com/5883081/covid-19-transmitted-aerosols/ (last visited Mar. 20, 2021); Ramon Padilla & Javier Zarracina, *WHO agrees with more than 200 medical experts that COVID-19 may spread via the air*, (last updated Sept. 21, 2020), www.usatoday.com/in-depth/news/2020/04/03/COVID-19protection-how-masks-might-stop-spread-throughcoughs/5086553002/ (last visited Mar. 20, 2021); Nan Zhang, Jianjian Wei, Hui-Ling Yen, and Yuguo Li, *Short-range airborne route dominates exposure of respiratory infection during close contact*, 176 BLDG. AND ENV'T (June 2020).

[26] Kevin P. Fennelly, *Particle sizes of infectious aerosols: implications for infection control*, 8 LANCET RESPIRATORY MED. 9, P914-24 (Sept. 1, 2020), https://www.thelancet.com/journals/lanres/article/PIIS2213-2600(20)30323-4/fulltext (last visited Mar. 20, 2021).

[27] Muge Cevik, Julia L Marcus, Caroline Buckee, & Tara C Smith, *Severe Acute Respiratory Syndrome COVID-19 2 (SARS-CoV-2) Transmission Dynamics Should Inform Policy*, CLINICAL INFECTIOUS DISEASES (2020), https://academic.oup.com/cid/advance-article/doi/10.1093/cid/ciaa1442/5910315 (last visited Mar. 20, 2021).

a research letter concluding that a restaurant's air conditioning system triggered the transmission

of COVID-19, spreading it to people who sat at separate tables downstream of the restaurant's

airflow.[28]  Moreover, a study detected COVID-19 inside the HVAC system connected to hospital

rooms of patients sick with COVID-19.  The study found COVID-19 in ceiling vent openings,

vent exhaust filters and ducts located as much as 56 meters (over 183 feet) from the rooms of the

sick COVID-19 patients.[29]

      29.     Additionally, the CDC has stated that "there is evidence that under certain

conditions, people with COVID-19 seem to have infected others who were more than 6 feet

away" and infected people who entered the space shortly after the person with COVID-19 had

left.   A recently published (February 2021) systematic review of airborne transmission of

COVID-19 corroborated the CDC's concerns and recommended procedures to improve

ventilation of indoor air environments to decrease bioaerosol concentration and reduce COVID-

19's spread.

      30.     The CDC has recommended "ventilation interventions" to help reduce exposure

to the airborne COVID-19 in indoor spaces, including increasing airflow and air filtration (such

as with high-efficiency particulate air ("HEPA") fan/filtration systems).[30]  These and other

---

[28]   Jianyun Lu, Jieni Gu, Kuibiao Li, Conghui Xu, Wenzhe Su, Zhisheng Lai, Deqian Zhou, Chao Yu, Bin Xu, and Zhicong Yang, *COVID-19 outbreak associated with air conditioning in restaurant, Guangzhou, China*, 2020, 26 EMERGING INFECTIOUS DISEASES 7 (July 2020), https://www.nc.cdc.gov/eid/article/26/7/20-0764_article (last visited Mar. 20, 2021); *see also* Keun-Sang Kwon, Jung-Im Park, Young Joon Park, Don-Myung Jung, Ki-Wahn Ryu, and Ju-Hyung Lee, *Evidence of Long-Distance Droplet Transmission of SARS-CoV-2 by Direct Air Flow in a Restaurant in Korea*, 35 J. KOREAN MED. SCI. 46 (Nov. 2020), https://doi.org/10.3346/jkms.2020.35.e415 (last visited Mar. 20, 2021).
[29] Karolina Nissen, Janina Krambrich, Dario Akaberi, Tobe Hoffman, Jiaxin Ling, Ake Lundkvist, Lennart Svensson & Erik Salaneck, *Long-distance airborne dispersal of SARS-CoV-2 in COVID-19 wards*, SCI REP 10, 19589 (Nov. 11, 2020), https://doi.org/10.1038/s41598-020-76442-2 (last visited Mar. 21, 2021)/
[30]   CDC, *Ventilation in Buildings* (last updated Feb. 9, 2020), https://www.cdc.gov/COVID-19/2019-ncov/community/ventilation.html#:~:text=HEPA%20filters%20are%20even%20more,with%20SARS%2DCoV%2D2 (last visited Mar. 20, 2021).

remedial measures must be implemented, at high cost and extra expense, to reduce the amount of

COVID-19 present in the space and to make property safe for its intended use.

31.     These extreme measures demonstrate that COVID-19 causes direct physical loss,

damage or destruction to interior spaces.  And even then, those interventions, at most, reduce –

but do not eliminate – the aerosolized COVID-19 in an indoor space.

32.     COVID-19 may also be transmitted to people from physical objects, materials or

surfaces.  "Fomites" are physical objects or materials that carry, and are capable of transmitting

infectious agents, altering these objects to become vectors of disease.[31]  Fomite transmission has

been demonstrated as highly efficient for viruses, both from object-to-hand and from hand-to-

mouth.[32]

33.     The WHO has described fomite transmission as follows:

> Respiratory secretions or droplets expelled by infected individuals can contaminate
> surfaces and objects, creating fomites (contaminated surfaces).  **Viable SARS-CoV-2
> virus and/or RNA detected by RT-PCR can be found on those surfaces for periods
> ranging from hours to days**, depending on the ambient environment (including
> temperature and humidity) and the type of surface, in particular at high concentration in
> health care facilities where COVID-19 patients were being treated.  Therefore,
> transmission may also occur indirectly through touching surfaces in the immediate
> environment or objects contaminated with virus from an infected person . . . .[33]
> (Emphasis added).

34.     In addition to studies cited by the WHO, numerous other studies and scientific

articles have discussed fomite transmission as a mode of virus transmission, including, but not

limited to:

---

[31]  Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/fomite (last visited Mar. 20, 2021).
[32]  CDC, Jing Cai, Wenjie Sun, Jianping Huang, Michelle Gamber, Jing Wu, Guiqing He, *Indirect Virus
Transmission in Cluster of COVID-19 Cases, Wenzhou, China, 2020*, 26 EMERGING INFECTIONS DISEASES 6 (June
2020), https://wwwnc.cdc.gov/eid/article/26/6/20-0412_article (last visited Mar. 20, 2021).
[33]  *See, e.g.*, WHO, *Transmission of SARS-CoV-2: implications for infection prevention precautions* (Jul. 9, 2020),
https://www.who.int/news-room/commentaries/detail/transmission-of-sars-cov-2-implications-for-infection-
prevention-precautions (last visited Mar. 20, 2021).

a.      A study of a COVID-19 outbreak published by the CDC identifying elevator buttons and restroom taps as possible causes of the "rapid spread of SARS-CoV-2" in a shopping mall in China.

b.      A National Institutes of Health study published in the New England Journal of Medicine finding that COVID-19 survives up to 4 hours on copper, up to 24 hours on cardboard, and up to 3 days on plastic and stainless steel and suggesting that people may acquire the virus through the air and after touching contaminated objects.   Indeed, Zurich's own Risk Engineering Department republished the study on Zurich's website and restated the study's conclusion when discussing the fomite transmission of COVID-19 in a workplace.

c.      An American Society for Microbiology article discussing fomite infection as involving both porous and non-porous surfaces, and occurring through a fomite's contact with bodily secretions, hands, aerosolized virus from talking, sneezing, coughing, etc., or other airborne viral particles that settle after a disturbance of a fomite (e.g., shaking a contaminated textile such as clothing merchandise).   According to the researchers, "[o]nce a fomite is contaminated, the transfer of infectious virus may readily occur between inanimate and animate objects, or vice versa, and between two separate fomites (if brought together)."   Generally, frequently touched surfaces can become highly transmissive fomites.

d.      A CDC research letter reporting that COVID-19 can remain viable on polystyrene plastic, aluminum, and glass for 96 hours in indoor living spaces.

e.      A Journal of Hospital Infection article citing studies revealing that human COVID-19 can persist on inanimate surfaces like metal, glass, or plastic for up to 9 days.

35.     Importantly, COVID-19 has been detected on environmental objects and surfaces from symptomatic, pre-symptomatic and asymptomatic individuals.[34]  Fomites transform the surface of property into a potentially deadly COVID-19 transmission device.  A study published in the Journal of Epidemiology and Infection demonstrated that after lockdown in the United Kingdom, COVID-19 transmission via fomites may have contributed to as many as 25% of deaths in that region.[35]

36.     Accordingly, the presence of COVID-19 in and on property, including in indoor air, on surfaces, and on objects, causes direct physical loss of or damage to property by causing physical harm to and altering property and otherwise making it incapable of being used for its intended purpose.

37.     Among other things, the presence of COVID-19 transforms everyday surfaces and objects into fomites, causing a tangible change of the property into a transmission vehicle for disease from one host to another.  The WHO's description of fomite transmission of COVID-19 expressly recognizes this physical alteration of property, describing viral droplets as "creating fomites (contaminated surfaces)"  (emphasis added).  "Creating" involves making or bringing into existence something new  – such as something that is in an altered state from what it was before COVID-19 was present on, in and around the property.

38.     COVID-19 adheres to surfaces and objects, harming and physically changing and

---

[34] *See* WHO, *COVID-19 disease 2019 (COVID-19) Situation Report - 73* (Apr. 2, 2020), https://apps.who.int/iris/bitstream/handle/10665/331686/nCoVsitrep02Apr2020-eng.pdf?sequence=1&isAllowed=y (last visited Mar. 20, 2021); Minghui Yang , Liang Li , Ting Huang, Shaxi Li, Mingxia Zhang, Yang, Yujin Jiang, Xiaohe Li, Jing Yuan, and Yingxia Liu, *SARS-CoV-2 Detected on Environmental Fomites for Both Asymptomatic and Symptomatic Patients with COVID-19*, https://doi.org/10.1164/rccm.202006-2136LE (last visited Mar. 20, 2021).
[35] A. Meiksin, *Dynamics of COVID-19 transmission including indirect transmission mechanisms: a mathematical analysis*, 148 EPIDEMIOLOGY & INFECTION e257, 1-7 (Oct. 2020), https://www.cambridge.org/core/journals/epidemiology-and-infection/article/dynamics-of-covid19-transmission-including-indirect-transmission-mechanisms-a-mathematical-analysis/A134C5182FD44BEC9E2BA6581EF805D3 (last visited Mar. 20, 2021).

physically altering those objects by becoming a part of their surface and making physical contact

with them unsafe for their ordinary and customary use.  Once COVID-19 is in, on, or near property,

it is easily spread by the air, people and objects, from one area to another, causing additional direct

physical loss or damage.

39.     Additionally, the presence of the dangerous and potentially fatal COVID-19 in

and on property, including in indoor air, on surfaces, and on objects, renders the property lost,

unsafe and unfit for its normal usage.  Respiratory particles (including droplets and airborne

aerosols) and fomites are physical substances that alter the physical properties of the interiors of

buildings to make them unsafe, untenantable and uninhabitable.

40.     In addition to being found in air samples,[36] COVID-19 remains stable in body

secretions (respiratory, urine, feces), on surfaces, and in sewage, particularly at lower

temperatures.[37]

## COVID-19 CANNOT BE REMOVED OR ELIMINATED BY ROUTINE CLEANING

41.     A number of studies have demonstrated that the Coronavirus is "much more

resilient to cleaning than other respiratory viruses so tested.[38] The measures that must be taken to

remove the Coronavirus from property are significant and far beyond ordinary or routine

cleaning.

42.     Efficacy of decontaminating agents for viruses is based on a number of factors,

including the initial amount of virus present, contact time with the decontaminating agent,

---

[36]  Zhen-Dong Guo, Zhong-Yi Wang, Shou-Feng Zhang, Xiao Li, Lin Li, Chao Li, Yan Cui, Rui-Bin Fu, Yun-Zhu Dong, Xiang-Yang Chi, Meng-Yao Zhang, Kun Liu, Cheng Cao, Bin Liu, Ke Zhang, Yu-Wei Gao, Bing Lu, Wei Chen, *Aerosol and Surface Distribution of Severe Acute Respiratory Syndrome COVID-19 2 in Hospital Wards, Wuhan, China*, 2020, 26 EMERG. INFECT. DIS. 7, 1583-91 (July 2020), https://pubmed.ncbi.nlm.nih.gov/32275497/ (last visited Mar. 20, 2021).
[37]  Nevio Cimolai, *Environmental and decontamination issues for human COVID-19es and their potential surrogates*, 92 J. OF MED. VIROLOGY 11, 2498-510 (June 2020), https://doi.org/10.1002/jmv.26170 (last visited Mar. 20, 2021).
[38] *Id.*

dilution, temperature, and pH, among many others. Detergent surfactants are not recommended as single agents, but rather in conjunction with complex disinfectant solutions.[39]

43.     Additionally, it can be challenging to accurately determine the efficacy of decontaminating agents. The toxicity of an agent may inhibit the growth of cells used to determine the presence of virus, making it difficult to determine if lower levels of infectious virus are actually still present on treated surfaces.[40]

44.     In order to be effective, cleaning and decontamination procedures require strict adherence to protocols not necessarily tested under "real life" or practical conditions, where treated surfaces or objects may not undergo even exposure or adequate contact time.74 Studies of coronaviruses have demonstrated viral RNA persistence on objects despite cleaning with 70% alcohol.[41]

45.     When considering disinfection and decontamination, the safety of products and procedures must be considered as well, due to the risks of harmful chemical accumulation, breakdown of treated materials, flammability, and potential for allergen exposure.[42]

46.     Given the inadequacy of conventional cleaning procedures, disinfection and decontamination measures include, but are not limited to, the use of harsh chemicals to perform deep disinfection, the removal and disposal of porous materials like clothing, cloth and other fabrics, and making changes to air filtration systems, and redesigning interior spaces, all performed at great cost and expense to Plaintiff and other property owners. These measures,

---

[39] *Id.*
[40] *Id.*
[41] Joon Young Song, Hee Jin Cheong, Min Joo Choi, Ji Ho Jeon, Seong Hee Kang, Eun Ju Jeong, Jin Gu Yoon, Saem Na Lee, Sung Ran Kim, Ji Yun Noh, & Woo Joo Kim, *Viral Shedding* and *Environmental Cleaning in Middle East Respiratory Syndrome Coronavirus Infection,* 47 INFECTION &CHEMOTHERAPY 4, 252-5 (2015), https://www.icjournal.org/DOIx.php?id=10.3947/ic.2015.47.4.252 (last visited Mar. 20, 2021).
[42] *Id.*

among others, demonstrate that the Coronavirus and COVID-19 cause physical loss of or damage to property.

47.     Many of the surfaces and materials discussed in the studies and articles cited above are used throughout Plaintiff's business and as part of its operations, including plastics, glass, metals, cloth and fabrics such.

48.     Moreover, the aerosolized Coronavirus particles and virions cannot be eliminated by routine cleaning. Cleaning surfaces in an indoor space will not remove the aerosolized Coronavirus particles from the air that people can inhale and become infected with the Coronavirus and develop COVID-19 – no more than cleaning friable asbestos particles that have landed on a surface from that surface will remove the friable asbestos particles suspended in the air that people can inhale and develop asbestos-related diseases.

49.     Given the ubiquity and pervasiveness of the Coronavirus, no amount of cleaning or ventilation intervention will prevent a person infected and contagious with the Coronavirus from entering an indoor space and exhaling millions of additional Coronavirus particles and virions into the air, further: (a) filling the air with the aerosolized Coronavirus that can be inhaled, sometimes with deadly consequences; and (b) depositing Coronavirus particles and virions on the surfaces, physically altering and transforming those surfaces into disease transmitting fomites.

## THE VIRTUALLY CERTAIN PRESENCE OF COVID-19 ON PLAINTIFF'S PROPERTY

50.     Given the high percentage of asymptomatic cases of COVID-19, it is certain Plaintiff's employees and customers contracted COVID-19.

51.     The science described herein is direct proof of the virtually certain presence of the Coronavirus at Plaintiff's properties.

52.     Additionally, given how highly contagious the Coronavirus is – recently even more so by the new, more contagious UK (known as B.1.1.7), South African (known as B.1.351) and Brazilian (P.1) variants of the Coronavirus that have only emerged during the 2020/2021 Policy Period and are now sweeping across globe – the global pervasive status of COVID-19 and the heavily-trafficked common areas in and around Plaintiff's facilities, it is statistically certain, or near-certain, that many other individuals at or in the vicinity of Plaintiff's facility contracted and carried the Coronavirus.

53.     The presence of the Coronavirus and COVID-19 in, on and near property, therefore, caused and continues to cause direct physical loss of or damage to Plaintiff's property and that of its and Direct and Indirect Dependent Time Element Locations, resulting in business income loss covered under the Policies.

54.     This direct physical loss of or damage to Plaintiff's property, independently and in connection with government closure orders, required Plaintiff to close its facility, incur extra expense, undertake costly efforts to protect and preserve property from further damage or loss, and, after reopening its facility, to continue to limit operations. This all resulted in a loss of significant income up to and including the filing this Complaint.

55.     At least 50 of Plaintiff's employees have contracted COVID-19 despite Plaintiff's significant attempts to sanitize its facilities and to mitigate the virus.

## GOVERNMENT ORDERS AND CLOSING OF PLAINTIFF'S FACILITY

56.     On March 11, 2020, the World Health Organization declared COVID-19 a pandemic.[43]

---

[43] https://www.who.int/emergencies/diseases/novel-coronavirus-2019/interactive-timeline/#! (last accessed on August 15, 2020).

57.     On March 13, 2020, the federal government declared a national emergency. Three days later, the CDC and members of the national Coronavirus Task Force issued public guidance, styled as "30 Days to Slow the Spread," that advocated for the first time far-reaching social-distancing measures, such as working from home; avoiding shopping trips and gatherings of more than 10 people; and staying away from bars, restaurants, and food courts.[44]

58.     State and local governments across the nation and governments around the world recognized the unprecedented and mushrooming outbreaks of COVID-19 across the nation and the Coronavirus's catastrophic impact through the direct physical loss of or damage to property and lives. As a consequence, many states issued "State of Emergency" Declarations in March 2020.

59.     On March 17, 2020, Iowa Governor Kim Reynolds issued a Proclamation closing all bars, restaurants, convention and public meeting spaces, bowling centers, arcades, and casinos, among other businesses, from gatherings of customers, dining, drinking, in-person services and gaming.

60.     Subsequent proclamations allowed Plaintiff to resume operations, but on a substantially limited basis which were not economically justifiable and at significant mitigation costs and effort.

61.     Governor Reynolds' March 17, 2020 Proclamation and subsequent proclamations, caused and continue to cause direct physical loss of or damage to Plaintiff's property and that of its and Direct and Indirect Dependent Time Element Locations, resulting in business income loss covered under the Policies.

## THE ZURICH EDGE POLICY

---

[44] The President's Coronavirus Guidelines for America, 30 Days to Slow the Spread, The White House and CDC (Mar. 16, 2020), https://trumpwhitehouse.archives.gov/wpcontent/ uploads/2020/03/03.16.20_coronavirus guidance_8.5x11_315PM.pdf (last visited Mar. 21, 2021).

62.     To protect its businesses in the event it suddenly had to suspend operations for reasons outside of its control, Plaintiff purchased The Zurich EDGE Policy that included Time Element coverage essentially providing coverage for loss of business income from Zurich American Insurance Company, or Zurich.

63.     In return for the payment of premiums, Defendant caused to be issued the Zurich EDGE Policy to the Plaintiff on December 31, 2019, Policy No. ERP0273025-02.

64.     Plaintiff paid premiums totaling $950,000 for insurance coverages for Policy No. ERP0273025-02.

65.     Zurich and/or its affiliates drafted the 2019/2020 Policy and 2020/2021 Policy (the "Zurich Policies"), which include the Zurich EDGE™ coverage form.  The Policy as issued included 31 endorsements which were an integral part of the Policy applied coverages Defendant sold to Plaintiff.

66.     When introduced in 2008, the Zurich EDGE™ coverage form was marketed as offering uniquely "broader coverage and greater flexibility" and would "enhance . . . our ability to serve customers in this important line of business and offers significant advantages for global property programs . . . ." Zurich's CEO made this announcement in a press release, dated April 22, 2008, and lauded the clarity of the form, boasting that "The Zurich Edge policy is clearly written with all limits, sub-limits and other critical coverage issues incorporated within the policy declarations."[45]

---

[45] *Zurich introduces The Zurich Edge™ for highly protected risks and global property markets*, Media Release Zurich (Apr. 22, 2008), https://zsl.zurichna.com/zus/zna_config.nsf/pages/9123da88864cd81485257433006ed710!OpenDocument&Click= (last visited Mar. 21, 2021).

Case 3:21-cv-00035-RP-SBJ   Document 7   Filed 05/10/21   Page 18 of 39

67.    Zurich did not limit its touting the EDGE™ coverage form to its press releases. Rather, Zurich made the same claims to insurance regulators. For example, in an Explanatory Memorandum Zurich filed with the California Department of Insurance and the Oregon Insurance Division on January 11, 2008 and February 5, 2008, respectively, Zurich claimed that the EDGE™ coverage form offers "our Insured's [sic] a very broad and flexible policy."

68.    The Zurich Policy sold to Plaintiff insures against "[a]ll risks of direct physical loss or damage from any cause unless excluded," and provides coverage for property damage losses, business interruption losses ("Time Element" per the policy language), and other losses.

69.    Section 4.01.01 of the Time Element coverage provision in the Policy requires Defendant to "pay for the actual Time Element loss the Insured sustains, as provided in the time Element Coverages, during the Period of Liability.  The Time Element loss must result from the necessary **Suspension** of the Insured's business activities at the Insured Location.  The **Suspension** must be due to the direct physical loss of or damage to Property) of the type insurable under this Policy other than **Finished Stock**) caused by a **Covered Cause of Loss** at the **Location**…."[46]

70.    Section 4.01.02 of the Time Element coverage provision further provides recovery to the extent the Insured is: unable to make up lost production within a reasonable period of time not limited to the period during which production is suspended; unable to continue such operations or services during the Period of Liability; and able to demonstrate a loss of revenue for the operations, services or production suspended.

71.    Pursuant to Section 4.02 of the Policy, the measure of the Time Element loss is the gross earnings, defined as the actual loss sustained by the Insured during the Period of Liability.

---

[46] Unless otherwise noted, capitalized and bolded terms herein are capitalized and bolded in the Policies.

72.     Section 4.02.03 of the Time Element coverage provision also provides "Extra Expense" coverage, which promises to pay "for the reasonable and necessary Extra Expenses incurred by the Insured during the Period of Liability, to resume and continue as nearly as practicable the Insured's normal business activities that otherwise would be necessarily suspended, due to direct physical loss of or damage caused by a **Covered Cause of Loss** to Property of the type insurable under this policy at a **Location**."

73.     Section 7.11 of the Policy defines "Covered Cause of Loss" as "All risks of direct physical loss of or damage from any cause unless excluded."  This definition does not state or otherwise define "Covered Cause of Loss" to require an actual alteration of property.

74.     The Policy defines "Occurrence" in relevant part as "All loss(es) or damage that is attributable directly or indirectly to one cause or a series of similar or related causes."

75.     The Policy defines "Operations" as "The Insured's business activities at the Insured Location."

76.     The Policy defines "Suspension" in relevant part as "The slowdown or cessation of the Insured's business activities…."

77.     The Policy does not define the phrase "direct physical loss of or damage to" property, nor does it separately define "direct", "physical", "loss", or "damage."

78.     The use of the disjunctive "or" in the phrase "direct physical loss of or damage to" means that coverage is triggered if either a direct physical loss **of** property **or** damage **to** property occurs.

79.     The Policy's use of the disjunctive word "or" between the terms "physical loss" and "damage" necessarily means that either a "loss of property" or "damage to property" is required, and that "loss" is distinct from "damage."

80.     Neither virus, pandemics, communicable disease, COVID-19, the Coronavirus, nor government closure orders are excluded causes of loss under the Policies.

81.      As set forth above, Coronavirus and COVID-19 caused direct physical loss of or damage to property at Plaintiff's Insured Locations.

82.     Coronavirus and COVID-19 also rendered such property unfit and unsafe for its normal usages, depriving Plaintiff of its property as contemplated by the Policy.

83.     Among the Zurich Policies' Time Element Coverages is GROSS EARNINGS, covering "the actual loss sustained by the Insured during the Period of Liability."

84.     The Zurich Policies include an EXTENDED PERIOD OF LIABILITY, providing in relevant part: "Upon the termination of the coverage for Gross Earnings loss under 4.02.01.01. this Policy will continue to pay the actual Gross Earnings loss sustained by the Insured" for up to 365 days.

85.     The Zurich Policies provide EXTRA EXPENSE coverage, covering "the reasonable and necessary Extra Expenses incurred by the Insured, during the Period of Liability, to resume and continue as nearly as practicable the Insured's normal business activities that otherwise would be necessarily suspended, due to direct physical loss of or damage caused by a Covered Cause of Loss to Property of the type insurable under this policy at a Location."

86.     As set forth herein, Plaintiff incurred Extra Expenses to resume and continue as nearly as practicable its normal business activities that would otherwise be suspended due to direct physical loss of or damage caused by the Coronavirus and COVID-19, costs associated with altering its property to protect it from physical loss of or damage, as well as the safety of its occupants, such as erecting barriers, altering air circulation, reconfiguring indoor spaces, disinfecting surfaces and materials, and providing PPE to employees.

87.     The Zurich Policies includes numerous Special Coverages that apply to Plaintiff's losses from the Coronavirus and COVID-19.

88.     The Zurich Policies provide CONTINGENT TIME ELEMENT coverage for "the actual Time Element loss as provided by the Policy, sustained by the Insured during the Period of Liability directly resulting from the necessary Suspension of the Insured's business activities at an Insured Location if the Suspension results from direct physical loss of or damage caused by a Covered Cause of Loss to Property (of the type insurable under this Policy) at Direct Dependent Time Element Locations, Indirect Dependent Time Element Locations, and Attraction Properties located worldwide…."

89.     The Zurich Policies define Direct Dependent Time Element Locations as including: "Any Location of a direct: customer, supplier, contract manufacturer or contract service provider to the Insured;" and "Any Location of any company under a royalty, licensing fee or commission agreement with the Insured."

90.     The Zurich Policies define Attraction Properties as: "A property within the distance described in the declarations of an Insured Location that attracts customers to the Insured's business" that is "[l]ocated within one mile(s) of the Insured Location."

91.     In plain English, the Zurich Policies provide coverage for Plaintiff's losses if certain types of nearby properties or the properties of Plaintiff's direct customers or suppliers suffer direct physical loss of or damage unless expressly excluded under the Policies. The Policies cover all risks of loss and do not contain any relevant exclusions for Plaintiff's losses.

92.     Among other things, as set forth herein, Coronavirus and COVID-19 caused direct physical loss of or damage at Locations of direct and indirect suppliers and service providers to

Plaintiff's facility and operations, and at properties that attract customers to the Plaintiff's casino, including the many business amenities and tourist attractions that are part of Plaintiff's operations.

93.     Additionally, as set forth herein, Coronavirus and COVID-19 rendered such properties unfit and unsafe for their normal usages, resulting in the deprivation of use of such properties.

94.     The Zurich Policies provide DECONTAMINATION COSTS coverage, which provides in relevant part: "If Covered Property is Contaminated from direct physical loss of or damage caused by a Covered Cause of Loss to Covered Property and there is in force at the time of the loss any law or ordinance regulating Contamination due to the actual not suspected presence of Contaminant(s), then this Policy covers, as a direct result of enforcement of such law or ordinance, the increased cost of decontamination and/or removal of such Contaminated Covered Property in a manner to satisfy such law or ordinance."

95.     The Coronavirus and COVID-19 caused direct physical loss of or damage to property throughout the area where Plaintiff's property is located, and caused the deprivation of use of such property, including property located at and within 1 mile of the Plaintiff's facility.

96.     The Zurich Policies provide PROTECTION AND PRESERVATION OF PROPERTY coverage, for "[t]he reasonable and necessary costs incurred for actions to temporarily protect or preserve Covered Property; provided such actions are necessary due to actual or imminent physical loss or damage due to a Covered Cause of Loss to such Covered Property" and "[t]he Gross Earnings loss or Gross Profit loss sustained by the Insured for a period of time not to exceed the hours listed in the Declarations prior to and after the Insured first taking reasonable action for the temporary protection and preservation of Covered Property."

97.     Plaintiff undertook costly measures necessary to protect its facility from further loss of or damage and to mitigate its damages. This included, among other things, altering its property to protect it from physical loss or damage, and taking measures to protect the safety of its employees and customers, including erecting barriers, altering air circulation, reconfiguring indoor paces, disinfecting surfaces and materials, and providing PPE to employees.

98.     No exclusions apply to the claims giving rise this lawsuit.

## DEFENDANT'S CONTAMINATION EXCLUSION DOES NOT BAR COVERAGE BECAUSE THE LOUISIANA ENDORSEMENT DELETED VIRUS FROM THE AMBIT OF THE EXCLUSION

99.     The Zurich Policies contain an exclusion at Section 3.03.01.01 (the "Contamination Exclusion"), which excludes "Contamination, and any cost due to Contamination including the inability to use or occupy property or any cost of making property safe or suitable for use or occupancy, except as provided by the Radioactive Contamination Coverage of this Policy."

100.    The Contamination Exclusion is deleted in each of the Policies by the Louisiana Endorsement which modifies the contamination exclusion and eliminates the virus exclusion by replacing the Contamination Exclusion with the following exclusionary provision: "Contamination or asbestos, and any cost due to Contamination or asbestos including the inability to use or occupy property or any cost of making property safe or suitable for use or occupancy." See Policy Endorsement, form EDGE-219-C (01/18) attached hereto as Exhibit C.

101.    Zurich drafted the elimination of the Virus Exclusion in the Louisiana Endorsement.

102.    Plaintiff did not draft virus elimination endorsement contained within the Louisiana Endorsement.

103.    Plaintiff had no role in drafting the Louisiana Endorsement which eliminates the virus exclusion.

104.    The Louisiana Endorsement is a pre-printed form in the Zurich EDGE™ form.

105.    The Louisiana Endorsement applies to the Policy at issue in this lawsuit, as the substance of endorsement itself does not contain any geographical or time restraints

106.    Defendant sold the Louisiana Endorsement eliminating the virus exclusion to Plaintiff as part of the Policy.

107.    The Louisiana Endorsement was added to the Policy by endorsement, and by its express terms it applies to all risks located throughout the U.S., and is not limited to property located in Louisiana or to a specific geographic area, unlike other endorsements contained in the Policy.[47]  See New York and Connecticut Endorsements attached hereto as Exhibit D and E.

108.    Policy further provides that "[t]he titles of the various paragraphs and endorsements are solely for reference and shall not in any way affect the provisions to which they relate." Thus, when the Louisiana Endorsement indicates that text is "deleted" from the Policy and "replaced" with alternative language, such change is made to the Policy itself.

109.    The Louisiana Endorsement also deletes and replaces the definitions for Contamination (Contaminated) and Contaminant(s), as follows:

   a. In the Zurich Policies, Zurich defined Contamination (Contaminated) as: "Any condition of property due to the actual presence of any foreign substance, impurity,

---

[47] The Zurich EDGE™ Form also includes other endorsements bearing the names of specific states in their titles, however, unlike the Louisiana Endorsement, certain of those endorsements – particularly the state-titled endorsements for New York and Connecticut – contain express language that states that the endorsement only applies to risks located in that state. The Louisiana Endorsement, however, has no such language and no such geographical limitation.

pollutant, hazardous material, poison, toxin, pathogen or pathogenic organism, bacteria, virus, disease causing or illness causing agent, Fungus, mold or mildew."

      b. In the Zurich Policies, Zurich also defined Contaminant(s) as: "Any solid, liquid, gaseous, thermal or other irritant, pollutant or contaminant, including but not limited to smoke, vapor, soot, fumes, acids, alkalis, chemicals, waste (including materials to be recycled, reconditioned or reclaimed), asbestos, ammonia, other hazardous substances, Fungus or Spores."

      c. The Louisiana Endorsement in each of the Zurich Policies replaces the definition of Contamination (Contaminated) with: "Any condition or property due to the actual presence of any Contaminant(s)."

      d. The Louisiana Endorsement in each of the Zurich Policies replaces the definition of Contaminant(s) with: "Any solid, liquid, gaseous, thermal or other irritant, including but not limited to smoke, vapor, soot, fumes, acids, alkalis, chemicals, waste (including materials to be recycled, reconditioned or reclaimed), other hazardous substances, Fungus or Spores."

110.    The Louisiana Endorsement removes Virus from application in the Contamination Exclusion.

111.    The Louisiana Endorsement deletes Virus from the Contamination Exclusion.

112.    The Louisiana Endorsement applies to all risks insured under the Zurich Policies without regard to the state or country of location of those risks.

113.    Under the Zurich Policies, coverage is dictated by the policy language, and not by headings and titles found in the Policy. Each of the Policies, at Section 6.20 explicitly states: "The

titles of the various paragraphs and endorsements are solely for reference and shall not in any way affect the provisions to which they relate."

114.    Zurich drafted Section 6.20 of the Policy.

115.    Plaintiff did not draft Section 6.20 of the Policy.

116.    Plaintiff had no role in drafting Section 6.20 of the Policy.

117.    Section 6.20 of the Policy is contained in the pre-printed Zurich EDGE™ form.

118.    The Policy contains Section 6.20.

119.    Defendant Insurers sold Section 6.20 of the Policy to Plaintiff as part of the Policies.

120.    The only time the word "Louisiana" appears in the Louisiana Endorsement is in the endorsement's title.

121.    None of the substantive provisions in the Louisiana Endorsement reference any limitation of the endorsement applying to policies issued in Louisiana only.

122.    None of the provisions in the Louisiana Endorsement state that the endorsement, or any portions thereof, applies only to property risks or locations in Louisiana.

123.    Additionally, the Louisiana Endorsement states that it modifies the Policy in its entirety, providing in bolded, all capitalized lettering, "THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY" (emphasis in original).

124.    Other endorsements to the Policy, however, expressly and unambiguously contains limitations that limits those endorsements to just the specific state in their title.

125.    For example, the Policies contain a New York state-titled endorsement, entitled "Amendatory Endorsement – New York," which provides "THIS ENDORSEMENT CHANGES THE POLICY AND APPLIES TO THOSE RISKS IN NEW YORK" (emphasis in original).

126.    Similarly, the Policies contain a Connecticut state-titled endorsement, entitled "Amendatory Endorsement – Connecticut," which provides "THIS ENDORSEMENT CHANGES THE POLICY AND APPLIES TO THOSE RISKS IN CONNECTICUT" (emphasis in original).

127.    Pursuant to Section 6.20 of the Policy, the word "Louisiana" shall not affect the content of the Louisiana Endorsement.

128.    Pursuant to Section 6.20 of the Policy, the word "Louisiana" with the title of the Louisiana Endorsement cannot be used to interpret the Policy as being limited to the state of Louisiana.

129.    Upon information and belief, Zurich has issued policies containing the Louisiana Endorsement to policyholders who have no Insured Locations, as that term is defined in Section 2.01 of the Zurich EDGE™ form, located in the state of Louisiana.

130.    Upon information and belief, Zurich included the Louisiana Endorsement in all policies containing the Zurich EDGE™ form that it issued in March 2019 to policyholders who have no Insured Locations, as that term is defined in Section 2.01 of the Zurich EDGE™ form, located in the state of Louisiana.

131.    Upon information and belief, Zurich has issued policies containing the Louisiana Endorsement to policyholders who have no Locations, as that term is defined in the Zurich EDGE™ form, located in the state of Louisiana.

132.    Upon information and belief, Zurich included the Louisiana Endorsement in all policies containing the Zurich EDGE™ form that it issued March 2019 to policyholders who had no Locations, as that term is defined in the Zurich EDGE™ form, located in the state of Louisiana.

133.    Upon information and belief, Zurich has issued policies containing the Louisiana Endorsement to policyholders who have provided Zurich with a Schedule of Locations, pursuant

to Section 2.01.01 in the Zurich EDGE™ form, that contain no locations that are located in the state of Louisiana.

134.    Upon information and belief, Zurich included the Louisiana Endorsement in all policies containing the Zurich EDGE™ form that it issued in March 2019 to policyholders who have provided Zurich with a Schedule of Locations, pursuant to Section 2.01.01 in the Zurich EDGE™ form, that contain no locations that are located in the state of Louisiana.

135.    Upon information and belief, Zurich included the Louisiana Endorsement in all policies containing the Zurich EDGE™ form that it issued in March 2019.

136.    Upon information and belief, Zurich included the Louisiana Endorsement in all policies containing the Zurich EDGE™ form that it issued in March 2020.

137.    The Louisiana Endorsement is the only endorsement in the Zurich EDGE™ form that addresses or mentions "Virus."

138.    Upon information and belief, when it sold the Zurich Policy to Plaintiff, Zurich knew that the Louisiana Endorsement, which eliminates the virus exclusion, applied policy wide and contained no geographical limitation.

139.    Upon information and belief, when it sold the Zurich Policies to Plaintiff, Zurich knew that the Louisiana Endorsement was not limited to only locations or risks in Louisiana.

140.    Upon information and belief, when Zurich was faced with escalating claims and lawsuits against it under the Zurich EDGE™ form, it knew that, by virtue of the Louisiana Endorsement, the Zurich EDGE™ form did not exclude coverage for Virus.

141.    Upon information and belief, when Zurich was faced with escalating claims and lawsuits against it under the Zurich EDGE™ form, it knew that, by virtue of the Louisiana Endorsement, the Zurich EDGE™ form did not exclude coverage for losses arising from the

Coronavirus or COVID-19. As a result, Zurich tried, but failed to re-insert Virus back into the Contamination Exclusion. In response and after it sold the Policies, Zurich began seeking and obtaining regulatory approval to add a geographic limitation into the Louisiana Endorsement that expressly limited it to only locations in Louisiana.

142.    Zurich's own regulatory filings confirm that it knew it was selling an insurance product that did not exclude loss from Virus.

143.    Zurich recently has been seeking regulatory approval for a new EDGE™ II Policy form, which would re-insert the virus exclusion back into the Louisiana Endorsement and therefore reinsert Virus into the Contamination Exclusion. At least one state regulator disapproved of the form in 2020.[48]

144.    Specifically, in December of 2019, just after the emergence of the first COVID-19 cases in China, Zurich filed a regulatory request to modify its policy language. Buried in the edits, and without reference to the significance of the change, Zurich's filing sought to add an exclusion for Virus, which it sought to become effective in July 2020 – after it had sold its "all risk" policy to Plaintiff.

145.    Having failed to win approval for the EDGE™ II policy form that bore the Virus exclusion and reeling from the wave of COVID-19 claims and lawsuits it faced, Zurich engaged the insurance regulators. This time, Zurich sought and obtained approval for a change to its EDGE™ form policy's Louisiana Endorsement to add a geographic limitation to the endorsement to limit its application to only locations in Louisiana – a limitation that did not exist in the Policies issued to Plaintiff.

---

[48] Zurich Edge New York EDGE II Filing at 2, 6 (submitted to New York on April 3, 2020; disapproved on September 22, 2020). This document was retrieved from the System for Electronic Rate and Form Filing (SERFF) created by the National Association of Insurance Commissioner (NAIC) for submitting and accessing filings. SERFF is the official system used by most states in the U.S.

146.    The Louisiana Endorsement was the only one of the Edge™ policy form's many endorsements that, since the emergence of the Coronavirus and COVID-19, Zurich ever sought or obtained regulatory approval to amend.

147.    In its explanatory memo, where it disclosed to the regulators what amendments to the Louisiana Endorsement it was seeking to make, Zurich explained that it was making or change – to a minor aspect of premium refunds – and (outside of attaching a redline of the proposed amendments to the Louisiana Endorsement) failed to explain or mention that it was also adding a geographical limitation to the endorsement.

148.    Zurich's addition of a geographic limitation to the Louisiana Endorsement, after it and the Defendant Insurers issued the Policies, demonstrates that the Louisiana Endorsement present in the Policies applies policy wide regardless of location.

149.    Zurich's addition of a geographic limitation to the Louisiana Endorsement, after it issued the Policies, demonstrates that Virus is not excluded from coverage by the Policies' Contamination Exclusion.

150.    In the Fall of 2020, after it began receiving claims for losses sustained as a result of the Coronavirus and COVID-19 and the physical loss of or damage to property that they cause, and the accompanying government closure orders (collectively, "COVID Losses") and being sued across the U.S., Zurich sought and received approval for a revised Louisiana endorsement to the Zurich EDGE™ form.[49] In Zurich's regulatory filing, it described the proposed amendment as follows:

---

[49] Louisiana EDGE Endorsement Filing, the "Modified Louisiana Endorsement") at 2, 6 (submitted to Louisiana on August 31, 2020; approved on September 8, 2020. This document was also retrieved from SERFF. *See also* Ex. C hereto (Modified Louisiana Endorsement as filed as an exhibit to the complaint in *Watson Woods Healthcare, Inc., et al. v. Zurich Am. Ins. Co., No. 1:21-cv-01150 (N.D. Ill.))*.

Pursuant to La. Stat. § 22:885(B), Zurich North America and all affiliated companies are updating Louisiana Amendatory Endorsements. The change removes language concerning premium refunds attributable to mortgagees when there is a policy cancellation. The only changes are those in the above referenced code.

151.    However, in addition to removing the language concerning premium refunds and without flagging the addition for the regulator, Zurich also added: "THIS ENDORSEMENT ONLY APPLIES TO LOCATIONS IN LOUISIANA." This geographically limiting language is absent in the Louisiana Endorsement contained in the Policies and in other Zurich EDGE™ form policies for which Zurich has denied coverage for COVID Losses across the country and around the globe. It is also the only amendment to the Zurich Edge Policy that Zurich has sought and received approval since the emergence of the Coronavirus, COVID-19 and the ensuing massive COVID Losses.

152.    Zurich's addition of the geographical limitation to the Louisiana Endorsement in the Modified Louisiana Endorsement demonstrates that the Policies' Louisiana Endorsement has no such geographical limitation.

153.    Zurich's addition of the geographical limitation to the Louisiana Endorsement in the Modified Louisiana Endorsement is an acknowledgment by Zurich that absent its newly added geographical limitation, the Louisiana Endorsement in the Policies (which lacks that geographical limitation) applies to all risks regardless of location – and not merely to those located in Louisiana.

154.    Even in the absence of the Louisiana Endorsement, the Policies' Contamination Exclusion applies expressly to "costs" and makes no mention of "loss." Accordingly, the Policies' Contamination Exclusion does not bar coverage for any of Plaintiff's losses arising from the Coronavirus or COVID-19.

155.     Upon information and belief, prior to the sale and issuance of the Policies, the Defendant Insurers were aware of exclusions being used in the insurance industry that purported to expressly exclude loss from "pandemic" or "pandemics" ("Pandemic Exclusions").

156.     Upon information and belief, the Defendant Insurers were aware of the risk of an infectious viral pandemic such as Middle East respiratory syndrome ("MERS"), Severe acute respiratory syndrome ("SARS") and Avian influenza prior to selling and issuing the Policies.

157.     The Defendant Insurers did not include any Pandemic Exclusions in the Policies.

## PLAINTIFF'S LOSSES

158.     Plaintiff derives the lion's share of its revenue from physical customer purchases and gaming. If Plaintiff's facility is closed, its revenues suffer.

159.     Plaintiff has incurred substantial costs directly attributable to damage to the property and inability to use its property to include requiring all employees and guests to be temperature-checked; continual sanitizing of all areas of the facilities; the insertion of plexiglass throughout the casino and restaurants; the removal of seating in the gaming area, slot area, bar and restaurant; and other major restrictions on the use of the property

160.     During substantial parts of 2020, Plaintiff's businesses were entirely closed. Even after reopening, Plaintiff's businesses were forced to operate at a substantially reduced capacity. Plaintiff has sustained and continues to sustain a substantial Time Element loss of its "gross earnings" as insured under the Policies.

161.     Plaintiff has incurred and will incur, among other covered losses, "Decontamination Costs" and destruction and disposal of contaminated property as well as costs for PPE under the Policies.

162.    Gross earnings loss for Plaintiff's operations as covered under the Policies, including losses incurred and future losses, is Contingent Time Element Loss given the closure of Plaintiff's Attraction Properties, Direct Dependent Time Element Locations, Indirect Dependent Time Element Locations, and as Civil Authority loss as a result of the government orders described above.

163.    Plaintiff is also incurring significant Extra Expense as insured under the Policies in order to resume and continue as nearly as practicable Plaintiff's normal business activities that otherwise would be necessarily suspended due to the direct physical loss of or damage to its property and those of its Attraction Properties, Direct Dependent Time Element Locations and Indirect Dependent Time Element Locations.

## DEFENDANT'S DENIAL OF COVERAGE

164.    On February 25, 2021 Plaintiff received a letter from Zurich by email stating that Zurich had completed its investigation and determined that there would be no coverage under the insurance policy for the claim.  The denial-of-coverage letter is attached hereto as Exhibit B.

165.    The purported reason for the denial of coverage as set forth in the declination letter is the policy's exclusion of loss due to the COVID-19 virus, and because there was no "direct physical loss or damage to" property.

166.    Defendant's denial of Plaintiff's claims relied in part on an exclusion contained in the policy regarding a loss due to "contamination."

167.    The Defendant never sent an adjuster to visit, inspect or set foot in Plaintiff's facility to investigate Plaintiff's Claim.

168.    The Defendant Insurers did not conduct any investigation of Plaintiff's Claim.

169.    Among other things, the Defendant asserted in its denial letter that Defendant has not suffered "physical loss of or damage to" property from the Coronavirus and COVID-19 – ignoring the overwhelming evidence to the contrary and mischaracterizing the applicable policy language.

170.    The Defendant reached this conclusion despite never visiting Plaintiff's facility to verify the accuracy of this assertion and despite Zurich's website postings:

- about the physical nature of the Coronavirus;

- that "[c]oronavirus spreads from person to person primarily through droplets in the air when someone coughs or sneezes. But scientists have determined that the virus can spread from a surface to a person" and that people "can be infected by contacting contaminated surfaces or objects and then touching their eyes, nose or mouth"; and

- how "proper cleaning and disinfection of surfaces can help minimize the spread of the virus" – postings that remain on Zurich's website even today.[50]

171.    The Defendant also cited a Contamination Exclusion as a basis for denying coverage, asserting that "[t]he presence of the COVID-19 virus falls within the definition of Contamination" – they ignored and failed to mention the Policies' Louisiana Endorsement.

172.    Similarly, the Defendant's denial of coverage failed to acknowledge that the Louisiana Endorsement applies policy wide without geographic limitation and failed to disclose to Plaintiff that, only after selling the Policies to Plaintiff, Zurich, for the first time, added a geographical limitation to the Louisiana Endorsement.

---

[50] Risk Topics, *Cleaning and Disinfecting Plans During COVID-19 Outbreak* (April 2020),https://www.zurich.com/-/media/project/zurich/dotcom/industry-knowledge/covid-19/docs/cleaning-and-disinfecting-during-covid-19-outbreakrt.pdf?la=en&rev=e3c9d0882ef14be7b77587a4a95749a2 (last visited Mar. 21, 2021); *Cleaning and Disinfecting Plans During COVID-19 Outbreak,* Zurich (May 19, 2020),

173.   In light of the above, the Defendant Insurers' assertion of the Contamination Exclusion was a misrepresentation of the terms and conditions of the Policies.

## COUNT I
## DECLARATORY JUDGMENT AGAINST ZURICH AMERICAN INSURANCE COMPANY, or ZURICH
## PURSUANT TO IOWA RULES OF CIVIL PROCEDURE 1.1101

174.   Plaintiff re-alleges all of the above paragraphs 1 through 173 as if fully set forth herein.

175.   Plaintiff claims damages that are covered under the Time Element coverage (also known as business interruption coverage) provided in The Zurich EDGE Policy for which Plaintiff purchased and paid premiums.

176.   Defendant has denied coverage under the Policy.

177.   Plaintiff suspended its operations due to direct physical loss of and damage to its property caused by a covered cause of loss at its insured facilities, as required to trigger coverage under the Policy.

178.   At the time Plaintiff purchased the policy, Defendant knew that courts had held on numerous occasions that a condition making it impossible to use property for its intended use constituted "physical loss or damage to property."

179.   Additionally, as recently as January 19, 2021, the United States District Court Northern District of Ohio Eastern Division denied Zurich American Insurance Co.'s Motion for Summary Judgment in a case with a similar business interruption clause and identical to the issues in this case. *Henderson Road Restaurant Systems, Inc. v. Zurich American Insurance Co.* Case No. 1:20 CV1239.

180.   At all times material hereto, Plaintiff maintained reasonable expectations that the loss arising out of the Covid-19 pandemic and/or Governor Reynolds' Proclamation would be

covered under the Time Element coverage provided for in the Policy under the circumstances described herein, as indeed the very purpose of purchasing such coverage is to insure this type of loss.

181.    An actual justiciable controversy exists between the Plaintiff and Defendant with regard to whether the loss claimed by Plaintiff is covered under the policy that has been issued to Plaintiff.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in its favor and against the Defendant, including the relief of:

a.   Entering a Declaratory Judgment acknowledging the rights of the Plaintiff and obligation of the Defendant under the policy and declaring that the loss claimed by the Plaintiff is covered under Policy ERP0273025-02;

b.   Entering a Declaratory Judgment determining the exclusion based on Contamination does not apply to preclude coverage under these circumstances;

c.   Ordering payment of Time Element Coverages (business interruption) pursuant to the Policy purchased and all benefits provided under the Policy to be substantiated by the Plaintiff, and for such other and further relief as the Court deems proper, including costs and attorney fees.

## COUNT II
## BREACH OF CONTRACT

182.    Plaintiff re-alleges paragraphs 1 through 181 as fully set forth herein.

183.    Plaintiff's Policy is a contract under which Defendant was paid premiums in exchange for its promise to pay Plaintiff's losses for claims covered by the Policy.

184.    The Time Element coverage in the policy Requires Defendant to pay for Plaintiff's loss of gross earnings sustained due to the necessary suspension of its operations during the period of liability.

185.    Both Covid-19 and Governor Reynolds' Proclamation, independently and collectively, caused direct physical loss of or damage to Plaintiff's property resulting in the necessary suspension of Plaintiff's business activities and operations, thereby triggering the Time Element coverage (including the Extra Expense coverage) of Plaintiff's Policy.

186.    At all times material hereto, Plaintiff maintained reasonable expectations that the loss arising out of the Covid-19 pandemic and/or Governor Reynolds' Proclamation would be covered under the Time Element coverage provided for in the Policy under the circumstances described herein, as indeed the very purpose of purchasing such coverage is to insure this type of loss.

187.    The losses described herein are covered losses under the policy.

188.    Plaintiff has complied with the applicable provisions of the policy and has proven that the Plaintiff has experienced a covered loss and necessarily suspended its business operations as required by the policy.

189.    No valid policy exclusion exists to preclude coverage.

190.    By denying coverage for the claims and losses set forth herein, Defendant has breached its coverage obligations under the policy.

191.    As a result of Defendant's Breach of the Policy, Plaintiff has sustained significant damages for which Defendant is liable.

WHEREFORE, the Plaintiff respectfully requests that the Court enter judgment in favor of the Plaintiff and against the Defendant, including the following relief:

a.  An award to the Plaintiff and against the Defendant for the loss of gross revenue and

extra expenses substantiated by the Plaintiff, and for all other covered damages, and;

b.  Such other and further relief as the Court deems proper, including costs and

reasonable attorney fees for having to pursue this matter.

## JURY DEMAND

The Plaintiff hereby makes a demand for trial by jury on all issues so triable.

Respectfully submitted,

CARNEY & APPLEBY, P.L.C.

*/s/ James W. Carney*
JAMES W. CARNEY (AT0001327)


NICHOLAS J. MAURO (AT0005007)
303 Locust Street, Suite 400
Des Moines IA 50309-1770
Telephone:  515-282-6803
Facsimile:  515-282-4700
E-mail:  carney@carneyappleby.com
E-mail:  mauro@carneyappleby.com
**ATTORNEYS FOR PLAINTIFF**


## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true copy of the foregoing instrument was served upon one of the attorneys of record for all parties to the above-entitled cause by serving the same on such attorney at his/her email address as disclosed by the pleadings of record herein and via the courts CM/ECF filing service, on May 10, 2021 by:

CARNEY & APPLEBY LAW FIRM


Nicholas J. Mauro          AT0005007
400 Homestead Building

303 Locust Street
Des Moines, IA 50309
515-282-6803
515-282-4700 (fax)
ATTORNEY FOR PLAINTIFFS